Bergeron v. Boyle, No. S0990-99 CnC  (Teachout, J., May 21, 2002)

[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


**STATE OF VERMONT**
**CHITTENDEN COUNTY, SS.**


| | | |
|---|---|---|
| **ROBERT BERGERON and** | ) | |
| **CECILE BERGERON** | ) | |
| | ) | |
| **v.** | ) | **Chittenden Superior Court** |
| | ) | **Docket No. S 0990-99 CnC** |
| | ) | |
| **SIDNEY BOYLE** | ) | |


<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>


   This matter came before the court for a hearing on the merits on April 29 and 30, 2002.  Oral argument was heard on May 2, 2002.  Plaintiffs are represented by Robert O'Neill, Esq.  Defendant is represented by Michael S. Gawne, Esq.  Plaintiffs seek specific performance of a contract for the sale of real estate.  Defendant claims that a sales contract was never formed, or is unenforceable, or is voidable.  By Order of May 24, 2000, this Court, Judge Katz presiding, denied both parties' Motions for Summary Judgment and ruled that the contract was ambiguous, requiring a hearing to take extrinsic evidence to decipher its meaning.  Based on the evidence admitted and after consideration of the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.


**Findings of Fact**

   The Plaintiffs and the Defendant would each like to own the 100 acre farm on South Hero, including a farm house and farm outbuildings, that is the subject of this suit.

   Plaintiffs Robert and Cecile Bergeron are a husband and wife who have lived in Winooski for many years, where they raised eight children in a household in which both English and French were spoken.  Mr. Bergeron worked for his father and with his brother for 59 years, doing the mechanical side of a spring and welding business called Paul Bergeron and Sons.  He closed the business and retired approximately 3 years ago, after a stroke.  Mrs. Bergeron speaks

primarily French and attends church nearly every day.  After Mr. Bergeron's retirement, they began looking for a property to buy for their retirement, and were particularly interested in finding a property with buildings where Mr. Bergeron could store equipment he owned from his business.  On July 11, 1999, they were driving on South Hero, and saw a For Sale sign at a property that interested them, located next door to a church.  They stopped to inquire.

Defendant Sidney Boyle is a farmer and cattle dealer who appears to be about 40 years old.  He lives with his wife Kristeen on South Hero.  When he was growing up his father was in the Army and was gone a lot.  Mr. Boyle did not wish to have that kind of life; he liked it on his grandfather's farm, and on his uncle's farm in Danville, Vermont where he and his brothers worked when he was in high school.  When he was in college, he did summer farm work for Frank and Ellen Read, who then owned the farm on South Hero that is the subject of this suit.  He majored in animal science at UVM, worked on the Read farm for two summers, and began to work full time for Mr. Read after graduation.  He loved farming and dreamed of raising a family on a farm and working alongside his children and other family members.  When the Reads were ready to retire in 1986, they sold him the farm, which consisted of 150 acres of land, a house, and farm buildings.  He has owned it since, and has used it for dairy farming: milking cows and shipping milk, raising replacement cows, and haying.[1]  He also runs a business in which he buys and sells dairy cattle, using the farm property, and he has a third business of taking beef calves and cows from farms to a packing house in Swanton twice a week.  He owns another property on South Hero where he and his wife Kristeen live, consisting of a house and 8 acres, in addition to the farm at issue here, and he also leases other farm property under annual or biannual leases.  He is a hard worker, and is generally clearly focused on goals.  He obtains help from people with expertise when he needs to, but is largely self-reliant.

He and his wife were married in 1986.  In 1996, they began a series of tests related to fertility problems.  In that same year, the barn on their home property burned in a disastrous fire, and they lost 19 calves.  By 1998, they realized that they were not going to have biological children together.  In the meantime, Mr. Boyle's brother, who had worked with him on the farm and lived there with his family for many years, shifted from farming with Mr. Boyle to developing his own landscape business.  Mr. Boyle created a subdivision on the farmland so that his brother could own a separate lot but remain on the farm with his business and family.  In April of 1999, after it was apparent that the landscape business was not compatible with Mr. Boyle's farming, Mr. Boyle's brother moved  his business and family elsewhere.

By the spring of 1999, Mr. Boyle's dream of a family farm was eroding.  Though he was usually an easygoing, good-natured person, he began to withdraw from his usual pattern of friendly social interaction.  His wife Kristeen noticed a change in his behavior.  She attributed it to the isolation and pressures of his businesses, which he conducted alone after his brother left.  Although he had always been clear about his goals and active in pursuing them, he began to have

---

[1]In September of 1999 he stopped milking cows and shipping milk, but he continues the other activities related to dairy farming.

2

difficulty sorting out his priorities. He was having trouble sleeping, and became anxious and uneasy. His wife encouraged him to make a change to reduce his responsibilities, such as selling either the farm or their other property, but he could not figure out what to do. She began to realize that she would have to become active in helping to precipitate a change. She bought a For Sale sign that could be used for either property, although at first she did not show it to him. Then they began discussing the possibility of selling one or the other of the properties. Mr. Boyle began to focus on selling the farm as a solution.

In late June or early July of 1999, the two of them visited the Reads at their home. Mr. Boyle looked anxious and distressed. He sought advice. The Reads recommended that he get some help and take a break, or sell the milking cows. He kept suggesting that the only thing to do was sell the farm. They recommended that he not do so, but if he was going to, they suggested he get an appraisal. He already had some knowledge of the value of the farm property, as he had acquired information about the value of the lots when he had subdivided the farm into 3 specifically described parcels (100 acres, 21.2 acres, and 25 acre lots). Despite their suggestions of alternatives, he kept focusing on the solution of selling the farm. Mrs. Read, who was a nurse, suggested that he see a doctor. His wife had already made that suggestion, but he had not been ready to do so.

He continued his regular farming and business activities, and continued considering alternatives. There is no evidence that he was unable to carry on normal activities of life related to his farming business and personal financial affairs. In his personal behavior, he was not his usual self. He was fidgety, restless, and withdrawn. He had difficulty sleeping at night, and it became difficult for his wife to communicate easily with him. Other people who saw him on a regular basis, including Henry Robinson, could see that he was withdrawn and uncommunicative, and not sociable as he usually was. He later described feeling at the time as though he had cobwebs in his brain. There is no evidence that he made any poor or irrational decisions, either in his work or personal life. He began to think that perhaps he should seek help from a doctor, but he put it off.

On June 27, 1999, Mr. Boyle was at another person's farm engaged in business in connection with his cattle dealing. There he had a conversation with a realtor friend about the idea of selling his farm. He learned that the realtor had forms that could be used to make a contract to sell property. At that time he had had previous experience working with lawyers, accountants, and bankers on contracts and other kinds of financial transactions related to his business, and was familiar with the process of making business agreements. He was also used to acting for himself once he understood how processes worked.

On the July 4th weekend, Kristeen put the For Sale sign up at the farm, and Mr. Boyle did not protest. The sign stayed up, and he received a few telephone calls about the property over the next few days. On July 10th, Saturday, his realtor friend dropped off an envelope with some blank Purchase and Sales Agreement standard preprinted forms in it. On Sunday, July 11, 1999, after the morning milking chores, he and Kristeen were at the farm in the house, painting. When the Bergerons stopped by in response to the For Sale sign, he came out to greet them, and

3

confirmed that he was the owner of the property.

Mr. Bergeron asked about the price and acreage. Mr. Boyle responded that he was selling 100 acres of the 150 acres he owned, and stated that the price was $180,000. Mr. Bergeron asked if he and his wife could look around, and Mr. Boyle gave the Bergerons an extensive tour of the property. They went through the house first, and met Kristeen, as she was painting. The house, which was not lived in, needed repair. Then they toured the barn and farm buildings and sheds. Mr. Boyle then took them by car to view the back part of the acreage, which was accessed from a state road and was on top of a hill. He explained that a portion of the access to the rear portion was over a right of way he had created over the 25 acre parcel he had subdivided. They discussed a possible reconfiguration of the acreage, as Mr. Boyle was considering keeping the portion on the top of the hill with a good view, but the Bergerons indicated that they would prefer to keep the lot configured in the manner in which it was already subdivided so that they could buy the top of the hill. They returned to the farmhouse area, and continued discussing terms. Mr. Boyle wanted to have use of the outbuildings for a year for his machinery, hay, and equipment to give him time to move it. That was satisfactory to the Bergerons, as long as they had access to the house, since they envisioned starting renovations.

Mr. Bergeron wanted to know about the zoning on both the Route 2 frontage, where the house was, and the upper land accessed off Route 314. Mr. Boyle told him that both were zoned for both residential and commercial use. Mr. Bergeron stated that he would want to check out zoning regulations himself at the Town Clerk's office. Mr. Bergeron indicated that in order to close he wanted to be satisfied through investigation of his own at the Town Clerk's office that there were no problems with the title, compliance with zoning and subdivision regulations, applicable zoning regulations, encumbrances and liens, and any other legal defects of the property. Neither of the Bergerons stated that they wanted as a condition of their purchase any further inspection of the physical conditions of the property, such as the condition of the buildings. They discussed the price again. Mr. Bergeron asked about a reduction in price. Mr. Boyle remained firm on his stated price of $180,000.00. Mrs. Bergeron then said, "We'll pay $180,000.00." The Bergerons offered to give a $5,000.00 deposit right away, and Mr. Boyle agreed to accept it. Mr. Boyle wanted to put their terms in writing, and considered using a paper towel at hand, but stated that he had forms at his house, which he could go get. He left to go to his house to get the forms, and the Bergerons left to go get their son Peter Bergeron, who lived close by on South Hero.

The Bergerons, with their son Peter, got back together with Mr. Boyle on his return from his house, and the four made another complete tour of the house and grounds for Peter's benefit, including driving over the state road, across the right of way, and to the hilltop at the rear of the property. They returned to the farm buildings and Mr. Boyle produced the blank preprinted Purchase and Sales Agreement form. There was discussion of the length of time the Bergerons would have to prepare for the purchase. Mr. Bergeron wanted to have six months, and Mr. Boyle wanted it to be accomplished in two weeks. After a little back and forth on this point, they compromised on 30 days. Both sides understood that the investigations the Bergerons had identified had to be completed and legal documents prepared and the transaction closed in that

4

time period.  They intended the entire process to be completed in thirty days.

Mr. Boyle assumed responsibility for filling in the preprinted form.  He started at the top, and completed the lines as he went down.  The heading at the top of the document appears as follows:

### PURCHASE AND SALE CONTRACT
THIS IS A LEGALLY BINDING CONTRACT

The top line is in bold black letters, and the second line is in red letters.

The form is the standard one used by realtors showing properties to buyers on behalf of sellers, and is structured to be an "offer" by the Purchaser, with an "acceptance" by the Seller.  Near the top, in the paragraph entitled "Time for Acceptance," the form, as filled in, reads as follows, with the date handwritten by Mr. Boyle showing below as underlined:

Purchaser's offer is open for acceptance by Seller until <u>Aug 11</u>, 19<u>99</u> at MIDNIGHT ("expiration date").  If the offer is not accepted by the expiration date, it shall expire and be of no further force and effect.  Purchase has the right to revoke this offer prior to its acceptance by written notice of such revocation to Seller.  Acceptance is defined as Seller's execution of this contract and notification thereof to Purchaser as provided in Section 29.  Acceptance of this contract must occur prior to the expiration date or Purchaser's earlier revocation of this offer for the contract to be legally binding.  Oral notification of acceptance of this offer is not sufficient to create a legally binding contract.

The property was described as 100 acres +/- at 493 Route 2, South Hero, Grand Isle County, Vermont.  The price was specified as $180,000.00, and the contract deposit was identified as $5,000.00 in the form of a personal check.  Under paragraph 10, Special Conditions of Contract, there are two clauses, handwritten by Mr. Boyle in the same manner as the blanks were completed:

Purchaser will give seller 1 year from closing to move machinery, hay and other personal property off farm.
If purchaser revokes offer the $5,000.00 deposit will be refunded.

Paragraph 12 has lines for the insertion of a closing date, which were left blank.  Mr. Boyle signed under the block labeled ACCEPTANCE OF OFFER AND AGREEMENT TO SELL, in which it is stated: "Seller hereby accepts Purchaser's offer and agrees to sell the property at the price and upon the terms set forth in this contract and any addenda thereto."  Under "Date and time of acceptance," he wrote "7/11/99 4:15 pm."  The Bergerons expected and intended to sign the document.  Mr. Boyle told them that they did not need to do so.

Cecile Bergeron wrote out a personal check payable to Sidney Boyle in the amount of

$5,000.00. The Bergerons' address and telephone number were printed on the check. (Their social security numbers and telephone numbers were also on the contract form.) Mr. Boyle accepted the check.

There was conflicting evidence at the hearing on the meaning of the special conditions clause "If purchaser revokes offer the $5,000.00 deposit will be refunded." Mr. Bergeron testified that it meant he would get the deposit back if he found out there was a problem with the title or encumbrances on Mr. Boyle's ability to convey the property. Mr. Bergeron had been specific about wanting to check the title for ownership and encumbrance problems, to check zoning restrictions, and to verify that the subdivision had been done correctly. Mrs. Bergeron's testimony on this clause was unclear and inconsistent, and it appeared at trial that she did not have a clear understanding of the questions put to her in English concerning what would happen if Mr. Boyle tried to undo the contract, as her primary language is French. The court finds her testimony on this point unreliable. (Her testimony on other matters, when she seemed to have a clear understanding of the questions, was reliable.)

Peter Bergeron testified that he thought his father could withdraw from the contract for any reason. His testimony appeared to be based on inferences he had drawn from general conversation, and not on specific statements he heard. He also testified that he was an observer on that day, from the time he had arrived only, and he had not heard everything that had happened before or even every conversation between his parents and Mr. Boyle while he was there. His testimony on this point is therefore unreliable, as he did not hear all conversations between the parties themselves, nor any specific agreement. Mr. Boyle testified that the clause demonstrated the fact that the written agreement was simply an agreement to make a later agreement, and neither of the parties was intended to be bound by its terms. This is inconsistent with all of the other circumstances: the fact that very specific terms were agreed upon, a deposit paid and accepted, a decision made to reduce the agreement to writing on a printed form specifically designed to be a real estate sales contract, and a special trip made to return to his house to get the form to be used for that purpose. There is no evidence that the Bergerons negotiated for themselves the right to back out for any reason whatsoever. On the contrary, the evidence is that the Bergerons were attempting to lock in the deal in every respect, and were only concerned about their deposit in the event it turned out that Mr. Boyle could not convey title without encumbrances or legal defects, or that zoning and subdivision were not as represented.

The court finds that the purpose of the clause was to clarify that if the Bergerons discovered problems with the title or other encumbrances, or that the subdivision or zoning requirements were not as Mr. Boyle had represented them, or that there were any problems making the property unmarketable, they would be entitled to a return of their deposit as well as the right to withdraw from the obligations of the contract. This is the normal pattern of real estate contracts, and is set forth in fine print on the back side of the printed form at the end of paragraph 20: "If, at the expiration of thirty (30) days following the receipt of such notice or on the date set forth for closing, whichever is later, Seller is unable to convey marketable title free and clear of such encumbrances and defects, Purchaser may terminate this contract, and if so, shall receive back all deposit money and may, in addition, pursue all legal and equitable

remedies provided by law." There is no evidence that the parties read all of the fine print or looked for or failed to find such a clause in the printed form, yet it is clear that the Bergerons intended to investigate to see if there were problems with defects and encumbrances, and that they did not want to buy if there were. They also wanted their deposit back if there were. The clause was thus inserted for their benefit to make clear that not only did they not have to go through with the purchase if any such problems existed, they would also get their deposit back. Otherwise, Mr. Boyle might be able to claim it was a nonrefundable deposit since the property would have been taken off the market for 30 days. The use of the words "revoke" and "offer" by Mr. Boyle as the scribe and the Bergerons as the respondents--in place of the words "terminate" and "contract"--appears, from the extrinsic evidence, simply to reflect the lack of legal sophistication on the part of both parties. If "revoke offer" is replaced with "terminate contract", the clause protects the buyer in exactly the same manner as the preprinted language in paragraph 20 and as the Bergerons intended: "If purchaser terminates contract the $5,000.00 deposit will be refunded." Based on the parties' specific discussion, termination could only occur if the Bergerons found problems with encumbrances or title defects, or misrepresentations concerning the subdivision and zoning status.

This interpretation of the clause is consistent with the other credible testimony, and the evidence of surrounding circumstances:
    –the parties had reached an agreement, and sealed it with a writing signed by Mr. Boyle and a deposit paid by the Bergerons;
    –both Mr. Bergeron and Mr. Boyle had business experience with contracts and understood the basic principles, but did not have the sophistication to use the precisely correct language;
    –under "special conditions", they inserted clauses reflecting the terms of particular importance to each of them: Mr. Boyle wanted to make sure that he had the right to use the farm buildings for storage up to one year, and the Bergerons wanted to make sure that if there were encumbrances or defects or misrepresentations as to zoning and subdivision status, they could withdraw from the deal and get their deposit returned;
    –this interpretation is consistent with the particular worry that the Bergerons had expressed in the discussions, i.e., that their deposit would not be forfeited if there were title problems, even though Mr. Boyle had agreed not to sell to anyone else for the 30 days.

There is no evidence that the price or any of the terms of the contract were inconsistent with normal, rational market terms for the purchase and sale of the premises at the time. There is no evidence that Mr. Boyle behaved strangely or in any way out of the ordinary on July 11th when he met with the Bergerons and Peter Bergeron, or that his conduct gave them any reason to believe that he was not in full possession of his ability to think rationally and enter into a business contract.

Mr. Boyle and the Bergerons each kept a copy of the contract. On the following day, Monday, Mr. Bergeron called the Town Clerk's office and was advised to come on Wednesday, July 14th, to meet with the zoning administrator, who would be back from vacation. On Wednesday he and his daughter Christine went to the Town Clerk's office and met with the lister

and zoning administrator. He learned about specific zoning requirements and discovered that the farm was under the agricultural land use program that reduced taxes for farmers, but entailed a penalty tax if the land went out of farming. The Bergerons stopped by the farm and talked with Mr. Boyle. They asked if he would reduce the price because of the additional tax burden that the Bergerons would incur, and Mr. Boyle declined to reduce the price.

On Sunday, July 18th, the Bergerons visited the property again with friends, to show it to them. They had a brief social chat with both Sidney and Kristeen Boyle, who were at the farm. Mr. Boyle commented to the Bergerons that they were getting themselves a lot of repairs by planning to repair the old farmhouse.

That day or the next day, Monday July 19th, Christine dropped off a form, a Seller's Property Information Report, for Mr. Boyle to complete to provide information about the property. Mr. Boyle completed it that day. The same day, he decided to visit a doctor, and did so immediately. He was unable to see his usual doctor, and instead saw Dr. Dill, who was on call.

He explained to her that he had had difficulty sleeping for 3-4 weeks, had experienced involuntary muscle movements, and was anxious. He was under a lot of stress. He was "getting ready to sell his farm" and the symptoms had occurred in a similar time frame. She observed that he appeared "somewhat anxious" and that a muscle was twitching. She did not make a specific diagnosis, but ordered some tests to rule out certain possibilities, and she arranged for a follow up with his regular doctor in two days. She had an extended conversation with him, which he found helpful. As a consequence, he began to sort out his feelings about selling the farm, and began to think that he did not want to sell.

On Wednesday, July 21st, he returned for his appointment with Dr. Mann in the morning. He explained to Dr. Mann that he was under a lot of stress with needing to sell his farm, and was unsure of what he would be doing after that. He described sleeping problems, confusion, and anxiety, acknowledged that he felt like crying although he had not, but said no when asked if he had had thoughts about suicide. Dr. Mann observed the twitch and had the benefit of the lab test results. After a long conversation, Dr. Mann diagnosed a situational reactive depression secondary to stress, and recommended medication and follow-up in two weeks. Dr. Mann found his depression to be mild to moderate, and while it altered his consciousness to some degree, Dr. Mann later opined that it was only possible, and not probable, that it was significant enough to cause him to make bad decisions. Dr. Mann neither prescribed nor suggested any restrictions on his work or other activities of life, nor gave any warnings about his capacity to make major decisions, even though he knew Mr. Boyle was "getting ready" for the sale of his farm, which was a source of the stress underlying the depression. Dr. Mann had the benefit of a long conversation with Mr. Boyle prior to reaching his conclusions and recommendations.

Subsequently, Dr. Paul Cotton, a forensic psychiatrist, has reviewed documents and circumstances relating to the events of the spring and summer of 1999, and he met with Mr. Boyle on November 2, 2001. His opinion is that in the spring and summer of 1999, Mr. Boyle showed symptoms of depression in the mild to moderate range, manifested by difficulty

8

sleeping, inability to concentrate, and estrangement in personal relationships. He noted that despite these symptoms, Mr. Boyle continued to work, and exhibited no irrationality or lack of capacity in his usual business practices. While the depression affected Mr. Boyle's mood and thinking to the degree that he was withdrawn and felt as though he had cobwebs in his brain, Dr. Cotton found no evidence from his review that showed that Mr. Boyle's level of depression was so severe that it interfered with his ability or competence to make rational decisions. He found that Mr. Boyle was able to continue to function normally, even if his thinking and concentration were slowed down and his enjoyment of life was affected.

Mr. Boyle felt much better after his long conversation with Dr. Mann. That afternoon, he met with Christine again and returned the filled-out information sheet, but he told her that he no longer wanted to sell the farm. He wanted to keep on farming at the farm.

The next morning, he went to visit a lawyer, David Carter. As a consequence of the meeting, Mr. Carter prepared a letter dated July 22, 1999 that stated:

> Dear Mr. & Mrs. Bergeron,
> Please be advised our office represents Sidney Boyle of South Hero.
> Mr. Boyle has brought to our office a draft of an offer to sell his farm in South Hero. Due to physical and emotional difficulties at this time he is withdrawing the offer to sell the property. We are, therefore, enclosing your deposit check and apologize for any inconvenience.

The letter was sent certified, return receipt requested. There is no evidence of the time it was posted. In the absence of specific evidence, it can be presumed that it was posted at the usual time for law office practice, which is at the end of the work day, after 4:00 p.m.

In the meantime, in the morning that same day, Christine told her parents that Mr. Boyle did not want to sell. Upon learning this, at 10:05 a.m., the Bergerons both signed their copy of the Purchase and Sales Agreement, and Christine then hand delivered it to Mr. Boyle at midday. The reasonable inference from the evidence is that Christine delivered the contract signed by her parents to Mr. Boyle before Mr. Boyle's attorney posted the letter to the Bergerons.

The next day, the Bergerons received the letter, and enclosed returned check, from Mr. Boyle's attorney. On July 26th, they recorded a copy of the Purchase and Sales Agreement, executed by them as well as Mr. Boyle, in the Town Clerk's office. On July 27th, their attorney, Elizabeth Demas, wrote to Mr. Carter sending back the deposit check, stating that the Bergerons had accepted Mr. Boyle's offer at 10:05 a.m. on July 22nd and had delivered a signed copy to Mr. Boyle at 1:22 p.m., before the offer to sell was withdrawn, and stating further that the parties had a binding contract. She also stated that the Bergerons could close with 4-5 days notice, by August 11, 1999.

On August 4th, Mr. Boyle visited again with Dr. Mann, who noted that the depression was improving.

There was further communication between attorneys. The parties attempted in mid-August to resolve their differences over the land contract through mediation, which was not successful. Sometime in September, Mr. Boyle stopped milking cows and shipping milk, but maintained all his other work activities. He stopped taking Prozac, and when he returned to Dr. Mann on September 14th, Dr. Mann noted that the depression had improved. Some time in October or November, Mr. Boyle's depression had ended.

## Conclusions of Law

Various primary and alternative analyses have been presented by both parties with respect to the parties' obligations under these circumstances. The Court will address them under the framework of analyzing whether a contract was formed, and if so whether it is enforceable against Mr. Boyle, and if so whether it is voidable.

It is also noted that Defendant's attorney renewed at trial his motion to dismiss for lack of jurisdiction on the grounds that the action should have been filed in Grand Isle County and not Chittenden County. The Court stated on the record, and repeats here, that this motion was already denied by Judge Katz on October 7, 1999, apparently on the grounds that the claim sounded in contract. No request for an interlocutory appeal was made, and no motion for reconsideration was filed. The ruling of Judge Katz is the law of the case, and no reason has been advanced for seeking a second ruling from a different judge. Therefore, the undersigned declines to rule on the renewed motion. To do otherwise would be to encourage parties to renew motions upon a change of judge without alleging any reason why the issue should be raised a second time except to obtain a different ruling. Such conduct should not be encouraged, particularly in light of our system of regular judicial rotation, because of the significant potential of such a practice to undermine confidence in judicial decisions, delay the resolution of cases, and increase the costs of litigation.

### Was a Contract Formed?

Plaintiffs claim that a contract was formed between the parties, and that any ambiguity in the terms is resolved by the extrinsic evidence. Defendant argues that no contract was formed, first because there was no meeting of the minds, and alternatively because there was nothing more than an offer by Mr. Boyle to sell that was withdrawn before it was accepted. Defendant further argues that there was no consideration to support the formation of a contract.

The court concludes that by the time Mr. Boyle left to return to his home to get the real estate contract forms, and the Bergerons went to get their son, an oral agreement between the parties had been made, including all the essential terms. The property was identified as the 100 acres with the access rights to the rear land that Mr. Boyle had shown the Bergerons, the price was $180,000.00, the deposit amount of $5,000.00 had been agreed upon, the Bergerons had agreed to buy subject only to verification of marketable title, of the absence of encumbrances,

10

and of the representations Mr. Boyle had made concerning zoning and subdivision status. The parties had agreed that the Bergerons would not be obligated to buy if there were problems in any of those areas; otherwise the contract was binding. The parties had also agreed that Mr. Boyle would have the right to take 1 year to move items stored in the farm buildings. Although they had not yet agreed on a closing date, they had agreed that the purchase would be taking place in the near future (less than a year), rather than in the distant future. The contract was formed on the basis of mutual promises. Although it could not be enforced against either party because the Statute of Frauds requires a promise in a contract for the conveyance of real estate to be in writing to be enforceable, the contract itself was complete.

Defendant's current argument that there was no meeting of the minds is not supported by the facts. The credible evidence shows that a meeting of the minds had occurred, which is why Mr. Boyle went to fetch a document that by its own title stated it was intended to be a Purchase and Sale Contract, a "legally binding contract." At that moment, Mr. Boyle wanted to sell 100 acres for $180,000.00, and the Bergerons wanted to buy, and they had agreed upon specific terms.

Defendant's alternative argument that there was only an offer to sell that was revoked prior to acceptance is likewise not supported by the credible evidence. This is not a situation in which one party made an offer, and the other was considering whether to accept it or not. The process of offer, counteroffer, and acceptance had already been completed prior to the time the parties began to fill out the realtor's form. Even though it was not yet enforceable, the agreement had been reached. Consideration, at that stage, was in the form of mutual promises.

**Was the Contract Enforceable?**

Plaintiffs claim that the contract was enforceable because the requirements of the Statute of Frauds were satisfied with respect to Mr. Boyle's promise. Defendant claims that he had only signed an offer, which had not yet been accepted by the Bergerons, and that he withdrew it before they accepted it. Alternatively, he claims that under the written agreement, the consideration given by the Bergerons was illusory, and that without consideration, there could be no contract. On both bases, he claims there is no contract, and that the Statute of Frauds requires a contract to exist before it can be enforced.

The Statute of Frauds, set forth in 12 V.S.A. §181, provides that with respect to a "contract for the sale of lands, tenements or hereditaments, or of an interest in or concerning them. . .":

> An action at law shall not be brought . . . unless the promise, contract or agreement upon which such action is brought or some memorandum or note thereof is in writing, *signed by the party to be charged therewith* or by some person thereunto by him lawfully authorized.

The court concludes, as described above, that the parties had formed a contract prior to

11

engaging in the act of reducing it to writing. At the time they reduced it to writing, they made one more agreement as to terms: that the preparatory investigations would be complete and the transaction would be closed in 30 days, by August 11, 1999. In completing the preprinted form, they inserted this date in the paragraph entitled "Time for Acceptance" instead of in the paragraph on the closing date. Thus, by the time they entered into the *written* agreement, they had agreed upon an additional term to their contract, modifying it slightly. This agreement was signed by Mr. Boyle, and satisfies the requirement of the Statute of Frauds that there be an underlying contract, and that the promise or contract be signed *by the party to be charged.* 12 V.S.A. §181.

The credible facts do not support the Defendant's argument that Mr. Boyle only signed an offer to sell, and that he revoked it prior to its acceptance. In the first place, this was not simply an offer to sell. The Bergerons were in full agreement with the terms of the writing, wanted to sign it and did not do so only because Mr. Boyle told them it was not necessary. They gave a $5,000.00 deposit to seal the agreement. Secondly, even if it were to be interpreted as an offer only,[2] the Bergerons accepted it by signing it and delivering it to Mr. Boyle midday on July 22nd before Mr. Boyle had an opportunity to withdraw the offer by sending a certified letter through his attorney later that afternoon. While Defendant alternatively claims that he withdrew the offer by telling Christina that he no longer wanted to sell the farm on the afternoon of July 21st, the evidence does not support a factual or legal conclusion that he specifically told Christina that he was withdrawing an offer to sell the farm. He only told her that he did not want to sell the farm any more. An expression of desire is not the same as notice of withdrawal of an offer. The evidence shows that he only expressed his desire. This is supported by the evidence that he went to the lawyer the next day, presumably to explore his options. The attempt to withdraw the offer first appeared in the lawyer's letter, which was not sent until the afternoon of July 22nd, after the Bergerons had signed the contract. While this chronology is described to show that Defendant's argument that his offer was withdrawn is not supported by the facts or law, the primary reason for the court's decision has nothing to do with an offer/acceptance analysis. Rather, it is grounded in the conclusion that the parties had reached an agreement which was contained in the written contract that had been signed by Mr. Boyle on July 11, 1999, and became enforceable against Mr. Boyle on that date.

Defendant further argues that the consideration given by the Bergerons was illusory, and therefore not sufficient consideration to support a contract, because by the terms of the second

---

[2]Characterizing the written document as an offer to sell by the Seller is opposite to the language of the document, which is structured as an offer to buy by a prospective Buyer. This is not a particularly important point, as the court has concluded from the credible evidence that the parties had reached a full meeting of the minds on terms and formed a contract, which they happened to reduce to writing on a "Purchaser's Offer" form of document because it was what had been provided to Mr. Boyle, and not because it was correctly tailored to the circumstances under which their agreement was reached.

Special Condition, the Bergerons could have their $5,000.00 back simply by revoking the contract and asking for it back. The court has already found, as a matter of fact, that the purpose of that Special Conditions clause was to clarify that if the title was not marketable or there were encumbrances that could not be cured or if Mr. Boyle had misrepresented the subdivision or zoning status of the property, the Bergerons would be entitled to the return of their deposit; there were no other grounds for withdrawal from the agreement that would permit return of the deposit. This factual finding, based on the extrinsic evidence, clears up the ambiguity in the written document. *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575 (1988). Thus, as a matter of law, the $5,000.00 was not an "illusory" deposit, as it could not be reclaimed by a simple revocation for no reason at all. It could only be reclaimed if the one of the specific conditions was not met: the property was unmarketable, or there were encumbrances that could not be discharged at closing, or the zoning or subdivision status were not as Mr. Boyle had represented.

Furthermore, the giving of a bank draft for $5,000.00 amounted to a transfer of the use of funds to Mr. Boyle. The fact that Mr. Boyle had not negotiated the check is irrelevant; the Bergerons had directed their bank to pay him $5,000.00 of their money upon demand, and thereby deprived themselves of the use of that money. This by itself is sufficient consideration to support the contract.

Defendant also argues that there is no closing date specified in the written document, and this is a failure of an essential term since time was of the essence of the agreement. The absence of a closing date is not fatal to the enforceability of a contract. *Sisters & Brothers Investment Group v. Vermont National Bank*, 12 Vt. Law Week 77 (2001). A reasonable time for closing can be implied, and in this case, there are two important clues from which a reasonable closing date can be implied. First, the extrinsic evidence shows that both parties intended the closing to occur by August 11, 1999. This was the subject of specific negotiation and had been agreed upon by the parties. They happened to insert it into an inappropriate place in the printed form they used, but both knew that was the date. Furthermore, the fact that they negotiated for Mr. Boyle to have one year to remove his property from the farm buildings shows that they intended for the closing to take place in the near future. Otherwise, that one-year term would have little meaning.

Defendant also argues that the property is not identified with sufficient specificity to support a contract. The property is identified as 100 acres. This might be a valid argument if Mr. Boyle had not already gone through the subdivision process to subdivide his farm into 3 parcels, one of which consisted of 100 acres. The parties had negotiated over the possibility of changing the subdivision, and had reached an agreement to stick with the 100 acre parcel as previously defined through the subdivision process. Under these circumstances, the identification of the property as 100 acres is a sufficient description of the property to support a contract.

### Was the Contract Voidable?

Defendant seeks to void the contract on grounds of an irresistible impulse and/or mental

illness, specifically clinically diagnosed depression, at the time he entered into the contract. The court has already ruled in this case, and will not repeat here the reasons for the ruling, that the standard is as set forth in the Second Restatement of Contracts, §15 "Mental Illness or Defect." The applicable clause is §15(1)(b), which reads: "A person incurs only voidable contractual duties by entering into a transaction if by reason of mental illness or defect. . .he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition."

The alternative standard in §15(1)(a) is ". . .if by reason of mental illness or defect he is unable to understand in a reasonable manner the nature and consequences of the transaction." The evidence shows that Mr. Boyle had understanding of the nature and consequences of the proposed sale of the farm. His understanding was manifested in many separate acts involved in creating the transaction, stretching over an extended period of time, in which there is no hint that he did not have a clear understanding of the nature and consequences of the transaction: discussing documents with his realtor friend many days before the transaction, discussing the possible sale of this or the other property with his wife as a means of reducing work responsibilities, discussing the idea of selling the farm with the Reads, consenting to Kristeen putting up the For Sale sign, having previously gone through the subdivision process, introducing himself to the Bergerons as an owner interested in selling his property, showing and explaining the property and its attributes at length twice to the Bergerons and their son, negotiating terms that protected his specific interests, knowledge of subdivision, easement, and zoning issues pertinent to the property, taking the step of fetching a document designed to be an enforceable contract agreement, obtaining a deposit, and working through the printed document to reduce the terms of the agreement to writing. Furthermore, the testimony of both doctors supports the conclusion that Mr. Boyle understood the nature and consequences of the transaction. The issue is not whether or not the mental illness made him unable to *understand* the nature and consequences of the transaction, but whether or not it affected him such that he was "unable to *act* in a reasonable manner in relation to the transaction." (Emphasis added.) Therefore, it is §15(1)(b) that is the applicable standard.

The Comment to the Restatement provision explains that "[w]here a person has some understanding of a particular transaction which is affected by mental illness or defect, the controlling consideration is whether the transaction in its result is one which a reasonably competent person might have made." (Comment b.) The burden of proof is on the party asserting incompetency. (Comment c.)

There is no evidence that the transaction would not have been made by a reasonably competent person. There is no evidence that the price or terms were out of line with the market, or inconsistent with what a reasonably prudent owner in Mr. Boyle's shoes would have sought. The evidence is not that he made a poor bargain, but simply that he later changed his mind about decisions for his future.

Secondly, even if the court were to conclude (which it has not) that his depression made him unable to act in a reasonable manner (i.e., prompted him to act hastily to decide to sell

14

against his better judgment), in order for the contract to be voidable, the Bergerons would have had to have reason to know of Mr. Boyle's condition. The Defendant's evidence on this point is not persuasive. The Reads and Henry Robinson and his wife could see that he was withdrawn and not his usual self, but that is not the same as the Bergerons being able to tell, upon first meeting him, that he was unable to act in a reasonable manner in relation to the proposed purchase. On the contrary, all the evidence about the interaction between the parties on July 11th indicates that to the Bergerons and anyone observing, Mr. Boyle appeared able to act rationally with respect to his property. He had full knowledge of all of its physical and legal characteristics and could show and explain them, he could negotiate on his own behalf, he had clear limits on price and other terms, and he was able to exercise the initiative to produce a printed contract document and work through it in a manner consistent with a reasonable seller, who was not a professional realtor or lawyer, but who had the intelligence and ability to adapt the printed document to the needs of the transaction. There is no evidence that he conducted himself on that day in any manner that would cause someone in the Bergerons position to wonder whether they were negotiating with someone who could not act rationally on his own behalf. Finally, the opinion testimony of the doctors and the contemporaneous medical notes of Dr. Dill and Dr. Mann are all consistent with the conclusion that Mr. Boyle gave no outward appearance in mid-July of being unable to act in a reasonable manner in relation to a proposed property sale. The evidence that Mr. Boyle's wife did nothing to attempt to prevent the transaction (on the basis that Mr. Boyle was not able to act rationally) also supports this conclusion.

For these reasons, the court concludes that the Defendant has not met his burden of proof to show that the contract was voidable by reason of mental illness. The contract is therefore not voidable, and is enforceable against Defendant.

## ORDER

For the foregoing reasons, Plaintiffs are entitled to judgment on their request for equitable relief of specific performance of the contract.

A status conference will be scheduled to address the claims of the Plaintiffs for other forms of relief.

Dated at Burlington this \_\_\_\_ of May, 2002.

_____
Hon. Mary Miles Teachout
Superior Judge,  presiding